In re Estate of D. R. Peterson, Deceased.
Swedish American National Bank of Rockford, Appel-
lant, v. Martin R. Wahl, Administrator of the
Estate of D. R. Peterson, Deceased, Appellee.

Gen. No. 9,079.

Opinion filed September 3, 1936.

Large & Reno, of Rockford, and Ralph S. Zahm, for
appellant.

Nelson & Nelson and Karl C. Williams, all of Rock-
ford, for appellee; J. Phillip Dunn, of counsel.

Mr. Justice Wolfe delivered the opinion of the
court.

D. R. Peterson and O. E. Landstrom, on December 9,
1927, entered into a written agreement with August P.

Peterson relative to the sale of 1375 shares of the common stock of the Free Sewing Machine Company, at a price of $150,000. The agreement is as follows:

"AGREEMENT made this 9th day of December, 1927, by and between AUGUST P. PETERSON, first party, and O. E. Landstrom and D. R. PETERSON, second parties, all of Rockford, Illinois.

"WITNESSETH, WHEREAS, the First Party is the owner of 1375 shares of the common capital stock of the Free Sewing Machine Company, an Illinois Corporation, Now, THEREFORE, for and in consideration of the payments hereinafter to be made, the First Party agrees to sell and deliver to the Second Parties, the aforesaid 1375 shares of the common capital stock of the Free Sewing Machine Company for a total consideration of $150,000.00 to be paid in the manner and at the time as hereinafter provided, to-wit:

$25,000.00 on or before April 3, 1928;
12,500.00 on or before January 3, 1929;
12,500.00 on or before January 3, 1930;
12,500.00 on or before January 3, 1931;
12,500.00 on or before January 3, 1932;
12,500.00 on or before January 3, 1933;
12,500.00 on or before January 3, 1934;
12,500.00 on or before January 3, 1935;
12,500.00 on or before January 3, 1936;
12,500.00 on or before January 3, 1937;
12,500.00 on or before January 3, 1938;

"Second Parties agree to pay to the First Party interest on the aforesaid deferred payments at the rate of 6% per annum from January 1, 1928, payable semi-annually. Said principal and interest to be payable at such place or bank as First Party may designate; and when payments are made on principal and interest, the payments shall be endorsed on this contract.

"When the Second Parties have made all of the payments provided in this contract, the First Party agrees to deliver to the Second Parties the aforesaid 1375 shares of stock in the Free Sewing Machine.Company.

"It is further agreed that all dividends declared and paid on the aforesaid 1375 shares of Common Stock in the Free Sewing Machine Company shall be applied toward the payment of the principal and interest due on this contract.

"This Agreement shall extend to and be obligatory upon the heirs, administrators, and assigns of the respective parties, and is made, executed and delivered in triplicate.

"IN WITNESS WHEREOF the Parties have hereunto set their hands and seals the day and year first above written.

AUGUST P. PETERSON (Seal)<br>
First Party<br>
O. E. LANDSTROM   (Seal)<br>
D. R. PETERSON   (Seal)<br>
Second Parties.''

On January 31, 1928, the same parties made a supplemental agreement providing for the substitution of 1,375 shares of cumulative preferred stock of Consolidated Industries Inc., for the Free Sewing Machine Stock. The new agreement had additional provision that on the payment of each $25,000 of principal and interest after January 31, 1933, 125 shares of said preferred stock should be delivered to O. E. Landstrom and D. R. Peterson. On October 13, 1931, August P. Peterson assigned all of his interest in said written agreement to his seven children.

On July 24, 1933, D. R. Peterson died intestate, and Martin R. Wahl was appointed administrator of his estate. The seven children of August R. Peterson on September 30, 1933, entered into a written agreement with Martin R. Wahl, administrator as aforesaid and

O. E. Landstrom, which recited the former agreement, relative to the sale of said stocks and the reorganization of Consolidated Industries Inc., and provided that 1,400 shares of preferred stock of Consolidated Industries Inc., should be surrendered, and second preferred stock of new Consolidated Industries Inc., should be issued in lieu thereof, on the basis of 24½ shares of second preferred stock for each share of first preferred stock. Said contract further provided that such new stock should be issued in the name of O. E. Landstrom and Martin R. Wahl, administrator of the estate of D. R. Peterson, deceased, proportionately and ratably as said bank now holds 1,400 shares of cumulative preferred stock for O. E. Landstrom and Martin R. Wahl, administrator; that the certificates evidencing the new second preferred stock in the new corporation should be deposited with, and held by the bank in accordance with the terms and provisions of the foregoing agreement. The children of August P. Peterson entered into a trust agreement with the Swedish American National Bank, as trustee, providing for the transfer of all interest in, and to said agreement for said stock to be held by the bank, as trustee, under the terms and provisions of a trust agreement. On July 13, 1934, the Swedish American Bank, as trustee, filed its claim against the estate of D. R. Peterson for the sum of $109,671.90, alleging that there was a balance due of this amount on the purchase price of the said stock, from the estate of D. R. Peterson, deceased.

A hearing was had before the probate court of Winnebago county, and the claim was allowed for the full amount. The administrator of the estate appealed the case to the circuit court of Winnebago county. Upon hearing, the court entered an order disallowing said claim, and found that said agreements did not constitute a binding contract of purchase on the part of D. R. Peterson or on the part of Martin R. Wahl, adminis-

trator of the estate. The court ordered that the claim be dismissed and that procedendo issue to the probate court of Winnebago county, Illinois. It is from this order that the appeal is prosecuted.

The question which confronts us in this appeal is whether the several agreements, as set forth, constitute a valid and binding obligation to purchase the stock in controversy, or are mere options to buy the stock, which bind the seller, but do not bind the purchaser.

The appellants seriously insist that this is a contract to purchase so many shares of capital stock at a fixed price and that both buyer and seller are bound by it. On the other hand, the appellee contends that the contracts are unilateral and the defendant was not obligated to buy all, or any part of the stock, but if he should buy any of it, and it was delivered to him, then he would have to pay the price as designated in the agreement. In the case of *Vogel v. Pekoc,* 157 Ill. 339, at page 342, our Supreme Court in discussing what was necessary to constitute a mutual contract use this language: ''The next question to be determined is whether the contract is mutual. It is a general rule, well understood, that a contract between parties must be mutual. (*Weaver v. Weaver,* 109 Ill. 225; Chitty on Contracts, 15; Bishop on Contracts, sec. 78, p. 32; *Tucker v. Woods,* 12 Johns. 190.) In the case last cited it is said: 'In contracts, where the promise of the one party is the consideration for the promise of the other, promises must be concurrent, and obligatory upon both at the same time.' (1 Chitty, 297; 1 Carnes, 594.) In Chitty on Contracts, *supra,* the author says: 'The agreement, as before observed, must, in general, be obligatory upon both parties. There are several cases satisfactorily establishing, that if the one party never were bound, on his part, to do the act which forms the consideration for the promise of the other, the agreement is void, for want of mutuality.' In 1 Wharton on Con-

tracts, page 5, the author says: 'The parties to a contract, therefore, must both be bound. Supposing that one promise in consideration of the promise of the other, the one is not bound unless the other is bound. A promise to do a thing on an executed consideration is not a contract; nor is a promise to do a thing in consideration of an illegal or impossible engagement on the other side. Without this reciprocal obligation no contract can be constituted.' "

It is not seriously contended by either of the parties to this litigation, that this is not the correct rule, but they differ upon the interpretation of the language used in the contract. So far as we have been able to ascertain, neither our Supreme nor Appellate Court of this State have passed upon a similar question as is here presented. In the case of *Martin v. Cox,* 13 Ga. App. 236, the Supreme Court of Georgia had to construe a contract for the sale of stock and we quote both the contract and the Court's ruling thereon. "Cox sued Martin, alleging that Martin entered into a contract with him to purchase from him 12 shares of the capital stock of the Martin Furniture Company at a price not less than $1,500, and that he tendered the stock to Martin in pursuance of the contract, stating his desire to sell, but that Martin refused to take the stock, and consequently is indebted to him in the sum of $1,500, with interest. The contract (a copy of which is attached to the petition) was as follows: 'State of Alabama, Jefferson County. This agreement, entered into this the 19th day of August, 1909, witnesseth: That I, M. M. Martin, do hereby agree to purchase of Wm. J. Cox, one year from date, 12 shares of the capital stock of the C. A. Martin Furniture Company, at a price to be mutually agreed upon of not less than $1,500, should said W. J. Cox wish to sell same. Should the said Wm. J. Cox desire to sell, he shall give to the said M. M. Martin 30 days' notice of his intention to sell.'

(Signed) M. M. Martin, W. J. Cox.'' The jury found a verdict in favor of the plaintiff for $1,500. The defendant excepted to the overruling of his demurrer to the petition, and also to the judgment overruling his motion for a new trial. It is very clear, from a reading of the contract which we have quoted, that the contract is unilateral, and this phase of the case is not affected by the fact that Cox, as well as Martin, signed the instrument. Martin promised to buy the stock from Cox, if Cox, at the time designated, wished to sell it; but Cox did not promise to sell his stock to Martin, even if Martin should wish to buy it at that time, nor did he in any way obligate himself to sell, no matter how anxious Martin might be to buy. Under the provisions of the instrument Martin was bound to buy, but Cox was not bound to sell. It would be profitless for us to elaborate the proposition that a contract, to be enforceable, must be mutual. Negotiations, propositions, and tentative understandings between parties do not become contracts until both parties are bound. Generally speaking, if one party cannot hold the other to the terms of the contract, and compel him to perform under it, or bring an action against him for his refusal to perform, the transaction is unilateral, and no contract exists as against either party.

In the case of *Hardwick v. McClurg,* 16 Colo. App. 354, 65 Pac. 405, the Supreme Court of Colorado were construing a contract in which the plaintiff agreed to sell and deliver to the defendant, certain shares of stock, also a lease on a mining claim and an undivided one-half interest in a certain tunnel site on said mining claim. Kinney assigned his interest in said agreement to James A. McClurg. Default was made and Hardwick brought suit for the enforcement of the contract. After discussing and analyzing numerous other cases, the court concluded with the following: ''If, in the case at bar, Kinney had covenanted with the plaintiff to

make the several payments mentioned in the contract at the times specified, and the plaintiff, averring performance, or tender of performance, of his own agreements, had brought suit against Kinney to recover the installments in default, it would certainly be held that, although the defendant had incurred successive liabilities, his contract was entire. The difference between a situation like that and the one in hand is obvious. Kinney bound himself by no contract. It is a misuse of terms to say that his contract was entire, for he entered into none. He was at liberty to make as many payments as he chose, and stop when he saw fit; but, so long as he did pay, the plaintiff was bound to make the deliveries for which the payments called. When he ceased, the option, and the obligation of the plaintiff, were at an end; but the default could not affect rights which had previously attached.''

In the case of *Bashinski Brothers v. Lake,* 9 Ga. App. 352, 71 S. E. 702, Bashinski Brothers sued Lake for damages for alleged breach of the following contract: ''Georgia, Laurens County. This agreement, made and entered into this 19th day of May, 1909, between E. P. Lake, of the County of Laurens, state of Georgia, of the first part, and Bashinski Bros., of the county of Laurens, state of Georgia, of the other part, witnesseth: That for and in consideration of the sum of one ($1.00) dollar, cash in advance, the said E. P. Lake agrees to deliver to the said Bashinski Bros. fifty (50) bales of cotton averaging not under 500 lbs. per bale, at the price of 10 cents per pound, basis of good middling, standard Savannah classifications.'' (How the grades of cotton were to be determined and if a dispute arose, how they were to be arbitrated.) The contract was signed by both parties and was under seal.

The court in their opinion say, ''the petition alleges that the defendant, Lake, fails and refuses to deliver the 50 bales of cotton as he contracted and agreed to

do, by reason of which plaintiffs have been damaged in the sum of $1,093.74, being the difference in the price contracted for and the price of the cotton on the day when the same was to have been delivered under the contract. The court dismissed the petition on oral motion of the defendant, on the ground that the contract sued upon was unilateral, and was of no binding force or effect in law, and that there was no cause of action set out in the petition; and to this judgment exception is taken.

"We are clear that under these rulings the instrument sued upon was, for the reasons stated, unilateral, and not enforceable as an executory contract of purchase and sale. It is true that the contract in this case was signed by both parties, but this fact of itself does not make the contract one of mutuality. The instrument, to be a valid contract and mutually binding, must contain mutual agreements, or mutual promises, or a mutual consideration. In the cases of *Harrison v. Wilson Lumber Co.*, 119 Ga. 6, 45 S. E. 730, and *Cooley v. Morse,* 123 Ga. 707, 51 S. E. 625, the instruments alleged to be contracts were signed by both parties. In the latter case the Supreme Court says: 'It is true that the instrument sued on begins with the words, "This agreement, made this day between A. J. Morse and J. L. Cooley," and is signed by both parties. But Cooley nowhere agrees or promises to do any act, or binds himself in any way. He does not agree to take the lot, or to pay the purchase price'—just as in the present case Lake agrees to deliver, but Bashinski Bros. do not agree to receive or to pay for, the cotton."

It will be observed in the purported contracts in the present case, that August P. Peterson agreed to sell and deliver to the parties of the second part, certain shares of stock, but nowhere in any of the agreements, do Landstrom and D. R. Peterson agree to buy and pay

for said stock. The appellant argues that the stock was issued in the name of the appellees and accepted by them, and so it would then appear, that the seller had wholly performed the obligations of the contract and nothing remained to be done except the payment of the account by the buyer and therefore the defense of want of mutuality is not applicable. The evidence in this case does not show that any stock not fully paid for was delivered to the appellee, but it was delivered in escrow to the bank to be turned over to the appellee if certain payments were made.

It is our conclusion that the several agreements were unilateral and unenforceable and the circuit court properly found that the claim was not valid against the estate of D. R. Peterson, deceased.

*Judgment affirmed.*